**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(Fort Lauderdale Divisions)**
**www.flsb.uscourts.gov**

In re:                                    )
                                          )
GLOBAL ENERGIES, LLC f/k/a                )        Chapter 11 (Involuntary)
714 TECHNOLOGIES, LLC,                    )        Case No. 10-28935-BKC-RBR
                                          )
          Debtor.                         )
_____/

**MOTION TO DISMISS CHAPTER 11 CASE FOR BAD FAITH BASED ON**
**NEW AND ADDITIONAL EVIDENCE OF CONSPIRACY AND**
**MISREPRESENTATIONS**

Joseph G. Wortley ("Wortley"), by and through his  undersigned counsel, hereby moves

the Court to dismiss the involuntary chapter 11 case of Global Energies, LLC based on the

petitioning creditor's misrepresentations made to this Court and bad faith.  In support hereof,

Wortley states as follows:

**Jurisdiction**

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1334.  This is a core

proceeding pursuant to 28 U.S.C. § 157(2)(A) and (O).  Venue is proper in this Court pursuant to

28 U.S.C. § 1408 and 1409.  The statutory predicates for this Motion are sections 1112(b)(1) and

105(a) of 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

**Introduction**

2.      This Motion seeks to undo a serious injustice and improprieties perpetrated upon

the Movant and this Court.  This Court, including the chapter 11 trustee appointed in this case,

were misled as to the true facts underlying the involuntary petition filed by Chrispus Capital

Venture, LLC (herein "Chrispus" or the "Petitioning Creditor") and have continued to be misled

by the Petitioning Creditor as to the true facts during this case.  As a result, this bankruptcy case

should never have been filed, the order for relief should not have been entered and this case needs to be dismissed now.  Newly discovered evidence, including email exchanges and other documents, mandates dismissal for bad faith based on: (i) failure to disclose the true value of Global Energies' assets; (ii) manipulation of the creditor body by insiders; (iii) use of the Bankruptcy Code to circumvent state law regarding disputes between members of a limited liability company; and (iv) the secret manipulation of facts by insiders in order to create a fictitious default by Global Energies to falsely "qualify" the Petitioning Creditor to file the involuntary petition.  This evidence seriously calls into question the *bona fides* and validity of the involuntary petition, demonstrates that those involved in the decision to file the involuntary petition acted in bad faith and mandates the imposition of damages, including punitive damages, against Chrispus and its attorneys for a bad faith filing.  *See* Bankruptcy Code § 303(i)(2).

3.      This involuntary bankruptcy arose out of a two-party dispute between the equity holders of Global Energies – the Movant, Wortley on the one hand, and Richard Tarrant (owner of Chrispus) and James Juranitch on the other hand – and was filed for no purpose other than to effect the expulsion of Wortley from Global Energies for the self-interest and personal gain of Tarrant and Juranitch.  Moreover, Global Energies was <u>not</u> in financial distress on the Petition Date such that it or its alleged creditors needed the protection of the Bankruptcy Code.  The basis for the involuntary petition was manufactured by the Petitioning Creditor through secrecy and misrepresentation.  Further, once the order for relief was entered, the Petitioning Creditor used this Court and the provisions of the Bankruptcy Code to achieve its goal by stealing the assets of Global Energies through a contrived sale under Bankruptcy Code § 363 without full and proper disclosure of the true value of Global Energies.

This chapter 11 case must be dismissed and the Petitioning Creditor, as well as those who aided and abetted in its actions, should be severely sanctioned. *Aoude v. Mobile Oil Corporation*, 892 F.2d 1115 (1st Cir. 1989) ("A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.") (citations omitted).

## THE PARTIES

4.     **Global Energies, LLC**, formerly known as 714 Technologies, LLC (herein referred to as "Global Energies" or the "Alleged Debtor"), is the involuntary debtor in this case. Global Energies is a Florida limited liability company located in Broward County, Florida that, as of July 1, 2010 (the "Petition Date"), owned and operated a research, development, prototyping, production and distribution business engaged in the development of biofuels and carbon dioxide sequestering systems.[1]  As of the Petition Date, the members of Global Energies included Juranitch, Wortley and Crispus.  Pursuant to an Amended and Restated Operating Agreement dated May 29, 2009 (the "Restated Operating Agreement", a copy of which is attached hereto as Exhibit 1), the managing members of Global Energies as of the Petition Date were Juranitch (with a membership interest of 63%) and Wortley (with a membership interest of 32%).  As of the Petition Date, Chrispus held a membership interest in Global Energies of 5%. *See* Exhibit 1 at Section 2.1.

---

[1] Global Energies is primarily engaged in what is referred to as plasma arc gasification.  Plasma arc gasification is a waste treatment technology that uses electrical energy and the high temperatures created by an electric arc gasifier. This arc breaks down waste primarily into elemental gas and solid waste (slag) in a device called a plasma converter. The process has been intended to be a net generator of electricity, depending upon the composition of input wastes, and to reduce the volumes of waste being sent to landfill sites.

5.      **Wortley** is a citizen of the State of Florida and a resident of Boca Raton, Florida. Wortley is a party in interest in this case based on his position as a Managing Member of Global Energies and a creditor of Global Energies pursuant to a Note, Security Agreement and UCC-1 Financing Statement in excess of $200,000.00.  Copies of the Wortley Note, Security Agreement and UCC-1 are attached as Exhibit 2, Exhibit 3 and Exhibit 4, respectively.

6.      **Juranitch** is a citizen of the State of Florida and a resident of Fort Lauderdale, Florida.  Juranitch is a party in interest based on his position as a Managing Member of Global Energies.

7.      **Chrispus** is a New Hampshire limited liability company.  On information and belief, Chrispus is not authorized to conduct business in the State of Florida.[2]  Chrispus is the sole petitioning creditor for the involuntary petition that initiated this bankruptcy case and is a party in interest based on its status as an alleged unsecured creditor of Global Energies and its alleged purchase of  assets of Global Energies.  Ronald L. Roberts ("Roberts"), President of R&A Capital Management., LLC, a New Hampshire limited liability company, is identified as the designated representative of Chrispus.  On information and belief, Chrispus is owned and operated by Tarrant.

8.      **Tarrant** is believed to be a citizen of the State of Florida with a residence in Hillsboro Beach, Florida.  Tarrant is the owner and controlling party of Chrispus[3] and used his position as owner and controller of Chrispus to loan to and/or invest capital funds in Global Energies prior to the Petition Date.

---

[2] A search of the web page for the Florida Secretary of State indicates that Chrispus has, at no time, been authorized to conduct business as a foreign entity within the State of Florida.

[3] *See* Deposition Transcript of Richard B. Tarrant at pgs. 8-9 (herein cited as "Tarrant Depo. at ___"), attached hereto as Exhibit 5.

9.      **Barry E. Mukamal** ("Mukamal") is the chapter 11 trustee appointed in this case by the Office of the United States Trustee.

## PROCEDURAL BACKGROUND

10.     This case began with the filing of an involuntary petition [D.E. 1] under chapter 11 of the Bankruptcy Code on the Petition Date by Chrispus as the sole petitioning creditor.  *See* Bankruptcy Code § 303(b)(2).

11.     No defenses or objections were filed within 20 days of service of the Involuntary Petition.  On July 26, 2010, Chrispus filed a *Verified Motion for Clerk's Default* [D.E. 8] and an *Ex Parte Motion for Entry of Order for Relief Against Global Energies, LLC* [D.E. 9].   On August 3, 2010, this Court granted Chrispus' Ex Parte Motion and entered the Order for Relief [D.E. 13].

12.     Chrispus sought the appointment of an interim chapter 11 trustee [D.E. 4, filed July 7, 2010].   On July 29, 2010, Wortley entered his appearance in the case and moved to continue the hearing on the appointment of a chapter 11 trustee [D.E. 10] and on August 2, 2010, Wortley filed *Joseph Wortley's Response to Motion for Appointment of Chapter 11 Interim Trustee* [D.E. 12] stating he did not object to the appointment of an interim trustee but felt "it is important … to set the record straight and defend against the unfounded allegations set forth in the Trustee Motion …."  On August 4, 2010, this Court entered an Agreed Order authorizing and directing the appointment of a chapter 11 trustee [D.E. 16] and on August 5, 2010, the Office of the United States Trustee filed notice of the appointment of Barry E. Mukamal as chapter 11 trustee for this case [D.E. 18].

13.     On August 4, 2010, this Court entered an order setting deadlines for the filing of Schedules and Statement of Financial Affairs [D.E. 15] (herein collectively, the "Schedules"). Among other things, this Court ordered that, within 14 days from the date of the order, Wortley was to file the Debtor's Schedules and other forms and papers including a list of the 20 largest unsecured creditors of the Debtor.

14.     On August 6, 2010, the Petitioning Creditor, Chrispus, filed its own *Notice of Filing 20 Largest Unsecured Creditors*.   Among other things, this Notice stated that "the Debtor's representative, James Juranitch, as President of the Debtor, GLOBAL ENERGIES, LLC" [emphasis in original] had provided to Chrispus the Debtor's "List of 20 Largest Unsecured Creditors and Mr. Juranitch has requested that [Rice Pugatch Robinson & Schiller, P.A., counsel for Chrispus] file same since Mr. Juranitch currently has no counsel."[4]  [*See* D.E.s 19, 21].   The list of creditors filed included five unsecured creditors, none of which was noted as contingent, unliquidated, disputed or subject to setoff.[5]

15.     On August 17, 2010, Wortley filed his *Joseph G. Wortley's Ex-Parte Motion for an Extension of Time to File Debtor's Bankruptcy Schedules, Statement of Financial Affairs, and Other Documents by a Period of Three Weeks, Through and Including September 9, 2010* [D.E. 30], explaining that "Mr. Wortley has limited financial records in his possession and does not have custody or control [of] any of the Debtor's books and records.  Mr. Wortley has tried to obtain such books and records from James Juranitch ('Juranitch'), the President and other

---

[4] In fact, Juranitch testified that Mr. Pugatch's office prepared the List of Top 20 Creditors.  *See* Deposition Transcript of James Juranitch at pgs. 107-112 (herein cited as "Juranitch Depo. at __") attached hereto as Exhibit 6.
[5] None of the five creditors listed in the filing by Chrispus is known to be either an employee or an insider of the Debtor.

Managing Member of the Debtor who ran the Debtor's day to day affairs, to no avail."[6]    On that

same date, the Court entered an order granting Wortley's request.  [D.E. 32].[7]

16.    On September 30, 2010, Wortley filed *Joseph G. Wortley's Motion to be Relieved*

*of Obligation to File Schedules* [D.E. 46] explaining that "Wortley does not have sufficient

access to the Debtor's Books to prepare proper Schedules" and that, instead, the chapter 11

trustee, Juranitch and Tarrant possess the Debtor's books.    Thereafter, on October 11, 2010, the

chapter 11 trustee filed Schedules on behalf of the Debtor [D.E. 57] and on October 20, 2010 this

Court entered an Agreed Order [D.E. 73] resolving Wortley's obligation to file Schedules and

other papers and further ordering that Wortley, Chrispus and Juranitch "are each directed to file a

formal pleading in which they will, in good faith and to the best of their knowledge, supplement,

correct, amend, and/or confirm the information contained in the Trustee's Schedules (as to each,

a 'Supplement').  The Supplements shall be filed with the Court no later than Monday, October

25, 2010."  Wortley filed *Joseph G. Wortley's Supplement to Schedules Filed by Trustee* [D.E.

76] on October 25, 2010 confirming the Schedules filed by the chapter 11 trustee.[8]

17.    On October 6, 2010, the chapter 11 trustee filed the *Trustee's Expedited Motion*

*for (A) Approval of Bidding Procedures for the Sale of All of the Debtor's Assets and Break-up*

*Fee Pursuant to the Asset Purchase Agreement; (B) Scheduling a Hearing to Approve the*

*Selection of the Highest and Best Offer for Sale of All of the Debtor's Assets; and (C) Approving*

*Form and Manner of Notice of Sale and Certain Related Relief* [D.E. 51] (herein the "Trustee's

---

[6] During the first two weeks of this case, Wortley repeatedly asked Roberts to provide the information needed to prepare the Schedules.  Roberts refused to provide the information to Wortley.  *See* Exhibit 12 [*infra*]: Email exchanges dated July 13-14, 2010 between Wortley and Roberts.

[7] On September 1, 2010, Wortley's counsel of record, Genovese Joblove & Battitsta, P.A. filed its *Notice of Withdrawal of Counsel From Case and Request to Stop Electronic Notice* [D.E. 38] without explanation.  On September 29, 2010, David R. Softness, P.A. entered its *Notice of Appearance, Request for Service and Non-Waiver of Rights* [D.E. 45] as new counsel for Wortley.

[8] Chrispus and Juranitch, also ordered by this Court to submit Supplements to the Schedules on or before October 25, 2010, have not, to date, filed their Supplements.

Sale Motion").  The Trustee scheduled the Trustee's Sale Motion for a ten minute hearing to be held just five days later, on October 12, 2010.  [D.E. 52].  The U.S. Trustee immediately filed a limited objection to the Trustee's Sale Motion.  [D.E. 53].

18.    Wortley immediately responded to the Trustee's Sale Motion with *Joseph G. Wortley's Expedited Motion to Dismiss Case as Having Been Filed in Bad Faith* ("Wortley's Motion to Dismiss") [D.E. 54] and noticed a hearing on the same date as the Trustee's Sale Motion (October 12, 2010).  In addition, Wortley promptly noticed the depositions of Chrispus [D.E.s 58, 61, 64], Tarrant [D.E.s 59, 62, 65], Roberts [D.E.s 60, 63] and Juranitch [D.E.  67].  Thereafter, Chrispus noticed the deposition of Wortley [D.E. 69].

19.    On October 12, 2010, the Trustee's Sale Motion went forward and on October 21, 2010, this Court entered its *Order for (A) Approving Bidding Procedures for the Sale of All of the Debtor's Assets and Break-up Fee Pursuant to the Asset Purchase Agreement; (B) Scheduling a Hearing to Approve the Selection of the Highest and Best Offer for Sale of All of the Debtor's Assets; and (C) Approving Form and Manner of Notice of Sale and Certain Related Relief* [D.E. 70] (herein the "Bid Procedures Order").

20.    Wortley's Motion to Dismiss was continued from the October 12, 2010 hearing and rescheduled for November 10, 2010.  *See* this Court's Order entered on November 8, 2010 [D.E. 77].[9]

21.    Immediately thereafter, on November 9, 2010, Wortley filed *Joseph G. Wortley's Emergency Motions: To Continue Hearing on Motion to Dismiss; To Compel Production of Documents; and For Sanctions* [D.E. 80].  Wortley and Chrispus were in dispute regarding each

---

[9] The order continuing Wortley's Motion to Dismiss was submitted by the chapter 11 trustee, but contrary to the provisions of that Order ("Attorney Jeffrey P. Bast [counsel for the chapter 11 trustee…] shall serve a copy of this Order upon all interested parties."), the Order was served by counsel for Chrispus, the "stalking horse bidder" identified in the Trustee's Sale Motion and also the sole Petitioning Creditor that initiated this case.

party's response to requests for the production of documents.  Accordingly, Wortley sought an order directing Chrispus to produce documents and an order continuing the hearing on Wortley's Motion to Dismiss so that he could properly prepare supporting evidence.

22.    On November 9, 2010, Chrispus responded to Wortley's motion to continue the hearing on Wortley's Motion to Dismiss [D.E. 82] opposing any continuation of the hearing.

23.    Between November 10 and November 19, 2010, several events occurred which do not appear to be accurately recorded on the case Docket.  On November 12, 2010, Wortley filed *Joseph G. Wortley's Objection to Trustee's Motion to Approve Sale (Etc.)* [D.E. 85] but on November 10, 2010, this Court entered its *Order Denying Continuance* [D.E. 86].[10]  On November 18, 2010, Wortley filed *Joe Wortley's Notice of Withdrawal of Expedited Motion to Dismiss Case as Having Been Filed in Bad Faith* [D.E. 90] and on November 19, 2010, counsel for Wortley notified the Court that Wortley had withdrawn Wortley's Motion to Dismiss.  On November 19, 2010, Chrispus filed a *Notice of Filing Letter to The Honorable Raymond B. Ray Dated November 19, 2010* [D.E. 92] objecting to Wortley's withdrawal of the Wortley Motion to Dismiss and requesting the Court to enter a "memorandum order" prepared and submitted by Counsel for Chrispus.

24.    Notwithstanding that Wortley's Motion to Dismiss was withdrawn and notwithstanding the memorandum order requested by Chrispus, on November 30, 2010, this Court signed an *Order Denying Motion to Dismiss*, which was entered on the Docket on December 1, 2010 [D.E. 97].  The Order denied the Wortley Motion to Dismiss "without prejudice".

---

[10] The Order shows that it was signed by the Court on November 10, 2010.  However, the Docket shows that it was entered on November 15, 2010.  Further, the Order states that the motion to continue the hearing on Wortley's Motion to Dismiss was "DENIED without prejudice as MOOT."  [Emphasis in original].

25.     On November 30, 2010, the Court signed its *Order Approving Trustee's Sale of Personal Property Free and Clear of All Liens, Claims, Encumbrances and Other Interests and Granting Related Relief* ("Sale Order") [D.E. 98] approving the sale of the Debtor's assets to Chrispus.[11]  Among other requirements, the Court's Order directed that, "The Trustee shall file a report with the Court within twenty (20) days of Closing setting forth receipts and disbursements in connection with the sale."  To date, the chapter 11 trustee has not file the required report and it is, therefore, presumed that the sale of assets to Chrispus has not closed.[12]

26.     Wortley now moves this Court to dismiss this chapter 11 involuntary case as having been filed in bad faith through the collusion and conspiracy of Juranitch, Tarrant and other parties including acts to mislead this Court.


# FACTS

## The Global Energies Beginning

27.     Wortley and Juranitch agreed to go into business together in July 2008 to pursue opportunities presented by the several patents and patent applications held by Juranitch related to plasma arc gasification and power generation.  On or about July 14, 2008, they formed 714 Technologies, LLC in Florida.  Juranitch was designated as the Managing Member.  In November 2008, the company's name was changed to Global Energies, LLC[13] and Wortley was added a Managing Member.[14]  Wortley and Juranitch agreed that Juranitch would contribute

---

[11] As of the entry of the Sale Order, the Debtor's Schedules continued to be incomplete.  *See* footnote 8, *supra*.

[12] The Debtor in Possession's Financial Report #5 for the Period December 2, 2010 to December 30, 2010, filed by the chapter 11 trustee on January 12, 2011, includes no indication that the sale of assets to Chrispus has closed.  *See* Total Receipts Petition to Date: $34,027.55 (page 2); Total Other Receipts: $2.46 (page 3).

[13] For convenience, 714 Technologies, LLC and Global Energies, LLC are collectively referred to herein as "Global Energies".

[14] Global Energies, LLC was originally organized by Juranitch as a Delaware limited liability company, located in Boca Raton, Florida, on or about July 9, 2007.  Wortley was not aware of this at the time 714 Technologies was formed and/or when the name was changed.

to the company his patents and patent applications and Wortley would contribute working capital to the company.  *See* Deposition Transcript of Joseph G. Wortley at pgs. 17-18 (herein cited as "Wortley Depo. at ___"), attached hereto as Exhibit 7.

28.    Contemporaneous with the original Florida formation of Global Energies, Wortley and Juranitch executed an "Operating Agreement", attached hereto as Exhibit 8. Thereafter, on or about May 29, 2009, the Operating Agreement was superseded by the Restated Operating Agreement (collectively the Operating Agreement and the Restated Operating Agreement are referred to as the "Operating Agreements") in order to include Tarrant as a Member.  *See* Exhibit 1.

29.    Wortley's initial capital contribution to Global Energies was $23,000, which was paid on or about July 14, 2008.  When the Restated Operating Agreement was executed, Wortley increased his capital contribution by an additional $65,585.52 which was paid to Global Energies contemporaneously, making his total capital contribution $88,585.52.

30.    In addition to Wortley's capital contribution, he also loaned a substantial amount to Global Energies.  On or about April 17, 2009, Global Energies executed a Master Promissory Note in the amount of $200,000.00 payable to Wortley and, on or about that same date, Wortley made an initial advance of $50,000.00 to Global Energies.  Over the next few months of 2009, Wortley advanced the remaining $150,000 under the Master Promissory Note plus an additional $158,585.52.[15]  The Master Promissory Note was secured by a Security Agreement, executed by Global Energies on or about April 17, 2009, and a UCC-1 Financing Statement filed with the State of Florida on June 18, 2010.  *See* Exhibit 7: Wortley Depo. at 26-27.

---

[15] In addition, through July 31, 2010, Wortley and his affiliated companies provided services to Global Energies and paid various expenses of Global Energies totaling approximately $155,192.58.  *See* Proof of Claim filed by Joseph Wortley, Claim No. 1-1, a copy of which is attached hereto as Exhibit 9.

31.    In April and May, 2009, Wortley discussed Global Energies with Tarrant and Tarrant asked if he, too, could invest in Global Energies.  *See* Exhibit 5: Tarrant Depo. at 12.  As a result of their discussions, Tarrant – acting through his investment company, Chrispus – agreed to purchase a five percent (5%) equity interest in Global Energies and to loan $1,000,000.00 (the "2009 Chrispus Loan") to Global Energies and entered into a "Purchase Agreement", dated May 29, 2009, attached hereto as Exhibit 10, setting out the terms and conditions for Tarrant, acting through Chrispus, to purchase a five percent equity interest and receive options to purchase an additional five percent equity interest and a further ten percent equity interest.  *See* Exhibit 10 and Exhibit 11.[16]  The Purchase Agreement further set out the terms for the two $1,000,000 loans to Global Energies.  *See* Exhibit 5: Tarrant Depo. at 8-9.

32.    As a result of the negotiations between Wortley and Tarrant, the Restated Operating Agreement was entered into between and among Wortley, Juranitch and Tarrant, acting through Chrispus, making Chrispus a five percent (5%) equity Member of Global Energies.

33.    Throughout the rest of 2009 and early 2010, Juranitch continued to develop additional intellectual property and, along with the employees of Global Energies, attempt to market Global Energies to potential users of its technology.  Principal among those potential users of the technology were municipal governments that could use the technology to minimize or even eliminate their waste management facilities by turning the waste into energy for their communities.  Thus, along with the continuing efforts to develop the technology by Juranitch,

---

[16] Exhibit 11 is the hand-written agreement between Wortley and Tarrant outlining the terms to enable Tarrant, acting through Chrispus, to become a Member of Global Energies which resulted in the executed Purchase Agreement.  Among other things, these documents provide that on June 1, 2009, Tarrant, acting through Chrispus, was to purchase a 5% interest in Global Energies for $25,557.00 and also loan to Global Energies $1,000,000.00 with the option to purchase an additional 5% interest in Global Energies for $28,396.62 if he agreed to loan an additional $1,000,000.00 to Global Energies.  The Purchase Agreement also provides for a further option for Tarrant, acting through Chrispus, to purchase an additional 10% interest.

Global Energies' efforts focused on marketing that technology to various municipalities including those in North Carolina, Wisconsin and Iowa. *See e.g.*, Exhibit 12: email dated April 2, 2010 from Juranitch to Wortley, Tarrant and Bill Gates ("Gates", an employee of Wortley).[17] *See also* Exhibit 7: Wortley Depo. at 61-63.

34.     According to the terms agreed upon by Wortley, on behalf of Global Energies, and Tarrant, on behalf of Chrispus, the options for Tarrant, acting through Chrispus, to purchase an additional interest in Global Energies were coupled with an obligation for Chrispus to make a second loan of $1,000,000.   However, the option and the obligation were contingent on "completion of pilot plant or contract with [Wisconsin Energy] or other utility." *See* Exhibit 10 and discussion above.   As of May 10, 2010, that contingency had not been met by Global Energies. *See* Deposition Transcript of Ronald L. Roberts at pgs. 27-28 (herein cited as "Roberts Depo. at ___"), attached hereto as Exhibit 13.[18]

35.     By April, 2010, the amounts Global Energies owed to its creditors were not significant, excluding the $1,000,000 already owed to Chrispus and the approximately $300,000+ owed to Wortley.[19]   There were, at the time, several marketing efforts being pursued by Juranitch and the employees of Global Energies.[20]   Accordingly, it was important that Global Energies receive either the second $1,000,000 loan from Chrispus or additional funding from Wortley.   Given that the contingency set out in the Purchase Agreement for Tarrant, through Chrispus, to make the second $1,000,000 loan had not been met by the end of April 2010,

---

[17] Exhibit 12 includes several email exchanges among the parties.  Because "threads" of email are usually in reverse chronological order, for the convenience of the Court, included at the beginning of the Exhibit is a listing of the email messages in correct chronological order including pertinent quotes from each email message.

[18] Roberts is a seven percent owner of Chrispus and its President.

[19] *See* Exhibit 12: Email dated May 11, 2010 from Phillip Albrecht, Buffalo Power Electronics Center to Alan Reynolds, Craig Tompkins ("Tompkins", an employee of Wortley), Juranitch and Wortley forwarding Global Energies' April Financials.

[20] *See* Exhibit 12:  Email dated May 3, 2010 from Juranitch to Tarrant with copies to Wortley and Gates.

Wortley made clear to Tarrant that he was ready, willing and able to loan the necessary funds to Global Energies himself if Tarrant chose not to do so.    *See* Exhibit 7: Wortley Depo. at 126.

36.    Notwithstanding that the conditions had not been achieved by Global Energies to commit Chrispus to make the second loan, on May 10, 2010, Tarrant agreed that Chrispus would make the second loan and acquire the additional five percent interest in Global Energies.  *See* Exhibit 10; Exhibit 12: Email dated May 10, 2010 from Tarrant to Wortley ("we decided to go ahead now with the second 2 million [sic] …."); email dated May 10, 2010 from Tarrant to Roberts; Exhibit 5: Tarrant Depo. at 30-34; Exhibit 13: Roberts Depo. at 28.

37.    Shortly after Tarrant agreed that Chrispus would make the second loan to Global Energies, Wortley and Juranitch had a major confrontation.


**May 13-14, 2010**

38.    Prior to May 13, 2010, Wortley was concerned that Global Energies had not achieved the conditions set out in the Purchase Agreement with Tarrant and Chrispus to "complet[e a] pilot plant or contract with [Wisconsin Energy] or other utility."  Wortley believed that the lack of achievement was because Juranitch was "veering off track and not spending and concentrating on other things that would get Global to its goals."  Exhibit 7: Wortley Depo. at 69-70.  Wortley discussed his concerns with Tarrant and Roberts and believed they shared his concerns.  Wortley also tried to schedule meetings with Juranitch to discuss, among other things, the lack of progress and the need to involve an investment banker.  *See* Exhibit 7: Wortley Depo. at 61.  Juranitch finally agreed to meet with Wortley on the afternoon of May 12, 2010.

39.    Wortley expressed his disappointment with the Wisconsin Energies project and the general results of Global Energies compared to what Wortley and Juranitch had discussed

when they formed the company in 2009.  Wortley also asked about the status of the Iowa sales efforts.  During the discussion on May 12, Wortley provided Juranitch with an outline of how Wortley thought Global Energies should have been structured in 2009 based on what had, so far, been accomplished.  Wortley shared this outline for the purpose of discussion.  Juranitch ended the meeting abruptly and would not discuss any of these issues, including details on the Iowa proposal.

40.     Wortley and Juranitch met again the next day, May 13, 2010, and resumed the discussion about the status of Global Energies.  This second meeting was short and ended with Juranitch walking out.

41.     On the evening of May 13, 2010 and continuing into the early morning hours of May 14, 2010, Juranitch removed equipment, furniture and other personal property from the Global Energies warehouse and offices.   Some of the equipment taken by Juranitch was extremely valuable and all of it was important to the continued operation of Global Energies. *See* Exhibit 7: Wortley Depo. at 58-61; Exhibit 6: Juranitch Depo. at 84-86; Exhibit 12: Email dated May 14, 2010 from Carmen Santiago (employee of Buffalo Power Electronics Center[21]) to Wortley; Exhibit 14 (notes dated May 17, 2010 from Richard Lee, employee of Buffalo Power). Juranitch did not have authorization or consent to take this action either from the Board of Global Energies or, specifically, from Wortley, the other Managing Member of Global Energies.

42.     Juranitch was well prepared for his actions on May 13-14.  He had, in advance, personally rented a separate warehouse large enough to store all of Global Energies' equipment and other property, rented three large trucks into which he caused the equipment and property to

---

[21] Buffalo Power Electronics Center ("Buffalo Power") provided various consulting services for Global Energies including bookkeeping.

be loaded, and made arrangements with selected employees to help him, overnight, with the removal of the equipment and property.

43.     Juranitch was, at the time of the May 13-14 events, one of the two Managing Members of Global Energies.  Yet, none of Juranitch's actions on May 13-14 had been approved in advance by Wortley, the other Managing Member of Global Energies, and none of his plans or intentions had been revealed to Wortley during their meetings on May 12 and May 13.

44.     The next morning, Juranitch contacted Tarrant and told him to "put any stop to the second $'s you have funded", and that Tarrant do this "now".  See Exhibit 12: Email dated May 15, 2010 from Juranitch to Tarrant.  Thereafter, Tarrant instructed Chrispus not to make the second loan to Global Energies.  *See* Exhibit 5: Tarrant Depo. at 32.

45.     The effect of Juranitch's actions was to breach his fiduciary duty of loyalty to Global Energies, and its other Members, and to shut down the operations of Global Energies.[22]


**Actions to Oust Wortley**

46.     Prior to the events on May 13-14, Tarrant had already set in motion actions to remove Wortley from Global Energies, actions that ultimately lead Tarrant – acting through Chrispus -- to put Global Energies into bankruptcy for that sole purpose.

47.     In late April 2010, Roberts informed Wortley that Tarrant wanted a "larger piece of the pie" than just the five percent Tarrant then held or the ten percent that Tarrant would get if Chrispus made the second loan (*see* Exhibit 13: Roberts Depo. at 27-28) and on May 10, 2010, when Wortley talked to Tarrant about the second loan, Tarrant told Wortley that he wanted a larger equity interest in Global Energies.  Wortley agreed that they would negotiate additional equity for Tarrant at a later date.  *See* Exhibit 12: Email dated May 10, 2010 from Tarrant to

---

[22] Juranitch also had executed a Consulting Agreement with Global Energies which was breached by his actions.

Wortley; email dated May 10, 2010 from Wortley to Tarrant. Tarrant wanted to own a larger equity position in Global Energies because he knew it was on the verge of success.

48.     As discussed below, by late April 2010, Tarrant and Juranitch knew that Global Energies was about to enter into a contract for the use of the Global Energies technology, and that contract would spell financial success. *See* Exhibit 12: Email dated May 19, 2010 from Juranitch.

49.     Within a few days of the May 13-14 events, Tarrant and Juranitch began pulling together information that would be needed to put Global Energies into bankruptcy. Requests went out from Tarrant to Juranitch about the company's cash position and who possessed the company's books. *See* Exhibit 12: Email dated May 17, 2010 from Tarrant to Juranitch ("How [is] cash position and who keeps books?"). Alan Reynolds, Global Energies' chief engineer who had aligned himself with Juranitch during the May 13-14 events, communicated with employees of Global Energies to get copies of financial records. *See* Exhibit 12: Email dated May 17, 2010 from Reynolds to Santiago ("[C]ould you send me an electronic copy of the account payables").

**The Big Secret – Marion, Iowa**

50.     Wortley believed that Juranitch was not communicating to Wortley, his co-Managing Member, whatever efforts Juranitch was undertaking on behalf of Global Energies. Unknown to Wortley, Juranitch was focusing all of his attention on the project in Marion, Iowa. In fact, Juranitch and Tarrant were spending a great deal of time trying to close the deal with Marion. It would be a big contract for Global Energies and the launching pad for the big payoff everyone had been expecting.[23] Shortly after the May 13-14 events, Juranitch told Tarrant,

---

[23] Global Energies had been working with Wisconsin Energy on a project. However, that project never developed into any revenues for Global Energies.

"Working flat out on Iowa … have to make up significant ground."  *See* Exhibit 12:  Email dated May 17, 2010 from Juranitch to Tarrant.  On May 19, 2010, Juranitch provided Tarrant with information on the building they would use for the project in Marion, Iowa.  *See* Exhibit 12: Email dated May 19, 2010 from Juranitch to Tarrant ("Here is the Iowa building … engineered.").

51.      In late April 2010, Louis Circeo, a consultant to Global Energies, spent three days in Marion, Iowa along with Juranitch and Tarrant making a proposal to provide the city with the Global Energies technology in order to convert Marion's trash dump into renewable energy. Following that meeting, Juranitch informed Tarrant that, "The numbers are staggering and we are not yet attacking our most lucrative markets."  *See* Exhibit 12:  Email dated May 3, 2010 from Juranitch to Tarrant.  Wortley was never informed of either the facts of this trip or other developments regarding the Marion, Iowa project.

52.      On May 20, 2010, Juranitch submitted Global Energies' "Proposal – Plasma-Based Waste-to-Energy Conversion Technology Project" (the "Marion Proposal" to Marion, Iowa.  *See* Exhibit 15, attached hereto.  On the first page, the Marion Proposal states, "Global Energies is uniquely positioned as one of the only plasma suppliers that has the experience of designing and operating complete industrial complexes that must reliably operate 24/7.  We also possess years of plasma experience including operating one of the highest powered plasma development facilities in the world (0.6 MW)."  *Id*.  At page 19, the Marion Proposal provided a schedule calling for the contract with Marion, Iowa to be executed and the project begin on July 1, 2010.  *Id*.

53.      The Marion Proposal also provided a Cost Model based on Midwestern Disaster Area bonds and Federal Renewable Grant monies:

> One of the requirements for the pricing in this proposal is the successful availability of the Midwestern Disaster Area (MDA) bonds at 2.65%. It is hoped (but not required) that the Federal Renewable Grant monies will also be made available for this project. The availability of the grant will be heavily dependent on the start of construction date. With the above assumptions Global Energies is projecting to finance the facility on its own. We are also hoping to cut the MSW tipping rate to $34 per ton and allow Alliant Energy a 6% profit on the purchased back energy. This should be a "win-win-win" for all parties.

*See* Exhibit 15 at page 21 [emphasis added]. It also proposed that, "this facility is intended to be designed, built, owned, and operated by Global Energies." *Id*. at page 22 [emphasis added].

54.    By early June, it was clear that Marion, Iowa was prepared to enter into a contract for Global Energies' first full-scale project. There was just one problem: Chrispus, under the direction of Tarrant and with the agreement of Juranitch, was about to put Global Energies into bankruptcy. They had to get Global Energies replaced with a different company.

55.    On information and belief, Tarrant and Juranitch caused former employees of Global Energies – now employees of Plasma Power, LLC ("Plasma Power") and/or Chrispus – to travel to Marion, Iowa to explain to the city officials that the proposal originally presented by Global Energies had been changed, in name only, to Plasma Power. On further information and belief, they told the Marion officials that Plasma Power was, in some way, affiliated with Global Energies. *See* www.easterniowanewsnow.com posted news article, attached hereto as Exhibit 16.[24]

56.    Nevertheless, Juranitch continued to refer to Global Energies when discussing the Marion, Iowa project with the City Council. On **June 28, 2010**, Juranitch responded to questions raised by members of the City Council. "As you know Global Energies technology is specifically focused at taking syngas and converting it to a high energy density fuel that will burn

---

[24] "Plasma Power of Fort Lauderdale is a relatively new company, but Juranitch said he and others have been involved in the energy industry for decades. The company was spun off from another company to concentrate on plasma arc technology." *Id.*

efficiently in a gas turbin." [Emphasis added].  *See* Memo from Juranitch to "Charlie Kress and the team at Iowa", attached hereto as Exhibit 17.

57.     On June 29, 2010 – just two days before Chrispus would file the involuntary bankruptcy against Global Energies – the City Council in Marion, Iowa introduced the "Motion selecting Global Energies/Plasma Power, LLC, for future Plasma Arc Project."  *See* Marion, Iowa Tentative City Council Agenda for Tuesday, June 29, 2010, attached hereto as Exhibit 18.

58.     While the announcement by the city of Marion, Iowa was great news to Juranitch and Tarrant, and to Chrispus, it would also excite others into believing that Global Energies, *qua* Plasma Power, suddenly would have greatly increased value.  That would threaten their bankruptcy plans.  Accordingly, **no one involved with Juranitch, Tarrant and Chrispus made any announcement about the coming contract and, specifically, failed to disclose the information to this Bankruptcy Court or to the chapter 11 trustee**.

59.     On November 30, 2010, the City Council of Marion, Iowa introduced Resolution No. 21448 to approve a Memorandum of Agreement with Plasma Power, LLC regarding the Plasma Arc Project. On December 2, 2010 Resolution 21448 was passed by the City Council and the Memorandum of Agreement became effective.   The Memorandum of Agreement was executed by James Juranitch, President of Plasma Power, LLC, on November 28, 2010, two days before this Court entered the Sale Order approving the sale of the assets of Global Energies to Chrispus [Docket No. 98].   A copy of Resolution 21448 and the executed Memorandum of Agreement are attached as Exhibit 19.  The docket of this case, including the Schedules filed by Mukamal, does not include any document disclosing any information to the Court or the chapter 11 trustee regarding the Memorandum of Agreement with Marion, Iowa.

**The Bankruptcy Filing**

60.     As of May 18, 2010, Global Energies' aged payables totaled only $13,966.76, owed to a collection of sixteen (16) creditors.  Of these, only $5,923.67 were between 31 and 60 days due.  None of the payables was more than 60 days due.

61.     Tarrant's first priority was to take care of the Global Energies employees. Accordingly, Chrispus reached out to Priscilla Boehme, an employee of Global Energies and, on information and belief, Juranitch's live-in girl friend.  Boehme's job was to collect the financial information on amounts owed to employees, which she did and transmitted to Roberts' staff at Chrispus.  *See* Exhibit 12: Email dated May 23, 2010 from Boehme (transmitting Employee Banking Details); Email dated May 24, 2010 from Wyand (employee of Chrispus) to Boehme (requesting address of consultant of Global Energies who was owed for services).  With the information received from Boehme, Chrispus then arranged to wire to Key Bank in Florida the funds needed to cover pay checks and expenses for the Global Energies employees.[25]  *See* Exhibit 12:  Email dated May 24, 2010 from Wyand to Linda Skiathitis (employee of Chrispus); Email dated May 24, 2010 from Skiathitis to Roberts ("The wires for the employees at Global Energies have been sent to Key Bank.")

62.     The next step of the conspiracy was to whittle Global Energies' creditors down to less than twelve so that the involuntary petition could be filed by Chrispus as the sole Petitioning Creditor.  Juranitch and Tarrant worked together to decide which creditors should be paid.  For Juranitch, this was a matter of identifying which creditors were "critical" to the future business and operations.  *See* Exhibit 6: Juranitch Depo. at 106 ("I told them who I thought was critical.").

---

[25] Global Energies did not have an account with Key Bank.  On information and belief, the funds were wired into an account held by Chrispus at Key Bank and the checks to Global Energies' employees were prepared and issued from that Chrispus account.

63.     Tarrant was planning the bankruptcy filing at least as early as May 2010.  On the morning of May 25, 2010, Tarrant informed his counsel that, "As of tomorrow there will be less than 12 [v]endors on [accounts payable] list … what does that buy us again?"  *See* Exhibit 12:  Email dated May 25, 2010 from Tarrant to Tom Moody[26] and Roberts.  Moody promptly wrote back and explained:  "If a company has fewer than 12 creditors, then a single creditor can file for involuntary bankruptcy."  *See* Exhibit 12:  Email dated May 25, 2010 from Moody to Tarrant.

64.     Consistent with the conspiracy to oust Wortley and defraud him of his investment and interest in Global Energies, Tarrant told his lawyer and Roberts to keep the bankruptcy scheme "on [a] back burner".  *See* Exhibit 12:  Email dated May 25, 2010 from Tarrant to Moody and Roberts.  And he instructed Roberts to identify bankruptcy counsel in South Florida.  *See* Exhibit 12:  Emails dated May 27, 2010 between Tarrant and Roberts ("Do you know name of firms that are conflicted?").

65.     It is of no small consequence that these steps by Tarrant took place <u>before</u> the date the interest payment came due on the 2009 Chrispus Loan.  Thus, the decision to declare Global Energies in default of its obligation to Chrispus, and the decision to file the involuntary petition were made before there was any evidence that Global Energies was "generally not paying [its] debts as such debts become due".  *See* Bankruptcy Code § 303(h)(1).

66.     In the meantime, Tarrant and Juranitch were putting together a new company to take over the marketing and sales efforts of Global Energies.  In late May, Juranitch put together a proposal for a "NewCo" and sent it to Tarrant.  *See* Exhibit 12:  Email dated May 26, 2010 from Juranitch to Tarrant ("Attached is direction I'm going for NewCo.").  Tarrant responded that he had "made no commitment to finance or participate in a new venture", but he was "not

---

[26] Tom Moody, Downs Rachlin Martin PLLC, in Burlington, Vermont, is legal counsel to Tarrant.

saying I won't but first things first".  *See* Exhibit 12:  Email dated May 26, 2010 from Tarrant to Juranitch with copies to Roberts and Moody.

67.    It did not take long for that to change.  Within a few days, Juranitch had started working for the new company, Plasma Power, which was officially formed as a Delaware limited liability company on June 7, 2010, less than two weeks after Tarrant's "first things first" email. The organization documents show that the members of Plasma Power are Tarrant and Juranitch. It was set up specifically to replace Global Energies.  Tarrant testified on October 18, 2010 as follows:

> Q:  Who owns Plasma?
> A:  Chrispus 50 percent, and Jim 50 percent.  ***
>
> Q:  It [Plasma Power] was formed specifically for this purpose, because the impasse didn't seem to be solvable, so you formed Plasma, correct?
> A:  Partially correct.  We wanted Global to be settled, but we formed Plasma, because we had the people, we had some very smart people, and we wanted to keep going, but in a different direction, so that we could bring Global back to life, but we still had a business over here.  ***
>
> Q:  Whose idea was it to form Plasma and go off in this other direct?
> A:  Jim and mine.  ***
>
> Q:  How much did [Chrispus] invest?
> A:  Well, at that point in time I felt an obligation to pay the employees who had been employees of Global.  It got cut off, and they had moved from Detroit and where else down here.  ***
>
> Q:  So the employees of Global are now working for Plasma?
> A:  At some point in time, yes.  ***
>
> Q:  All of this cost money.  Who's putting in the money?
> A:  Chrispus.
> Q:  Chrispus is fronting all the costs?
> A:  Yes.
> Q:  Is Mr. Juranitch putting any money in?
> A:  No.
> Q:  What is his contribution?
> A:  His contribution is the engineering, his team, and some new technology that he's developed.

Q:  Patents?
A:  Yes.
Q:  Do you know how many?
A:  Half dozen maybe.  I'm not certain.

Exhibit 5: Tarrant Depo. at 45-47.[27]

68.     With some of the creditors of Global Energies paid by Chrispus so that there were

less than 12 remaining creditors[28], and with Plasma Power set up to take over the work Global

Energies had been doing, it only remained to take action to oust Wortley.  That action had also

been set into motion well in advance.  On June 8, 2010, Tarrant wrote to Wortley offering to buy

him out:

> You seem to believe that there is value in patents, but after talking with three
> different patent attorneys I can assure you there is nothing of value there, simply
> because there are only patents pending which will disappear if Jim doesn't defend
> them.  As you know, I ran a sizable company with unique software and we never
> once tried to patent anything.  I personally believe patents are overrated. In this
> vein and contrary to your belief, I think the only value in this company today is
> Jim himself.  Therefore, without taking sides in the dispute, I believe it best if the
> company returns your investment (worth nothing right now) and I go forward
> with Jim.

See Exhibit 12:  Email dated June 8, 2010 from Tarrant to Wortley.

69.     On June 13, 2010, Tarrant followed up with a written proposal to buy out

Wortley.[29]  The proposal provided a non-exclusive license for Wortley to use, on a limited basis,

the patents granted to Global Energies in exchange for Wortley releasing all of his ownership

---

[27] Notwithstanding Tarrant's testimony, Roberts testified that Chrispus owns 100% of Plasma Power with an agreement to give Juranitch a 50% ownership if and when he assigns new patents to Chrispus, patents that, according to Roberts, were "developed and filed in late June and July", meaning at least some of the "new" patents were developed and filed before the involuntary petition was filed by Chrispus and all were filed prior to the Sale Order.  See Exhibit 13: Roberts Depo. at 65-66.

[28] Chrispus and its lawyers apparently believed they had paid off enough creditors to get the number of unsecured creditors below twelve.  As discussed, infra, at paragraphs 122-127, subsequent discovery disclosed that, in fact, there were more than twelve unsecured creditors of Global Energies as of the Petition Date.

[29] Tarrant and Juranitch acknowledged that each "had a lot of input to" the buy-out proposal.  Exhibit 5: Tarrant Depo. at 42; Exhibit 6: Juranitch Depo. at 143-144.

interest in Global Energies.  Roberts touted the offer as a good thing for Wortley because "there

was nothing left in Global."

> Q: And the net result is, Mr. Wortley will be out of the company, correct, will
> have no ownership interest at all?
> A: Mr. Wortley would have a license over the technology that was in the
> company.
> Q: But he would have no ownership interest in Global?
> A: There was nothing left in Global.  Mr. Wortley would have all the patents and
> licenses that were in Global Technology.
> Q:  And what would [Chrispus] get?
> A: We would have the entity.  ***
>
> Q: So what is the purpose of a settlement where you got nothing?
> A: It's the opportunity going forward.   ***
>
> Q: Explain.  ***
>
> A: It's a name, okay, that's recognized, okay, by three or four different people
> that sales calls were made on, okay.  It's a name that was – took a lot of time to
> come up with and register, okay.  And we would have the ability to pursue other
> opportunities, okay, maintaining that same name, not in conflict with Mr.
> Wortley.

Exhibit 13: Roberts Depo. at 48-50.  Wortley was not interested.

70.      What Tarrant and Roberts did not tell Wortley was that, on the same day that

Tarrant made his original proposal to buy out Wortley – June 8, 2010 – Roberts executed the

involuntary petition to put Global Energies into bankruptcy and sent it to his new lawyers in

Florida.  *See* Exhibit 13: Roberts Depo. at 55-56.[30]  When Wortley turned down Tarrant's offer,

Roberts instructed his lawyers to file the involuntary petition.[31]

---

[30] Q: "Did you sign it [the voluntary petition] on June 8th?"  A:  "Yes, I signed it on June 8th."  Q:  "And I assume
you directed your attorney to hold it?"  A:  "That's correct."  *Id.*
[31] There was one more event that Tarrant wanted completed before Roberts filed the involuntary petition.  Months
before, Wortley had invited Tarrant to be his guest, all expenses paid, at the 110th U.S. Open Golf Tournament at
Pebble Beach in Monterey, California which took place between June 17 and 20, 2010.  Tarrant and his wife went to
the Tournament as guests of Wortley and his wife between June 14 and 21, 2010.  During that time together, Tarrant
never disclosed to Wortley that (i) Chrispus considered the 2009 Chrispus Loan in default because the interest had
not been paid on May 29th; (ii) Tarrant and Juranitch had created a new company – Plasma Power; (iii) Chrispus was
paying the Global Energies employees; and (iv) upon his return to the East Coast, Tarrant's Chrispus would put into

71.     Before Roberts did file the involuntary, Wortley made one more attempt on his own to resolve the disputes.  On June 26, 2010, Wortley wrote to Juranitch offering to meet and work out their differences.  *See* Exhibit 12:  Email dated June 26, 2010 from Wortley to Juranitch.[32]

72.     Roberts, who was copied on Wortley's email, immediately emailed Juranitch and provided him with a proposed restructuring of Global Energies that would reduce Wortley's stake in Global Energies to 25% and remove him as a Managing Member in favor of Tarrant and Juranitch.  Two days later, Juranitch wrote to Wortley:  "Due to the extreme violations of the Restated Operating Agreement by yourself, and the consequent destruction of Global Energies caused by your actions there is no point in talking at this juncture.  A new agreement will need to be put together.  Until there is close consensus [sic] on this new agreement there is no point in further verbal communications."  Exhibit 12:  Email dated June 28, 2010 from Juranitch to Wortley.  On the same date, Roberts sent the new proposal to Wortley "[i]n anticipation of our phone call this afternoon …."  Exhibit 12:  Email dated June 28, 2010 from Roberts to Wortley.

73.     Wortley replied to both Juranitch and Roberts with the request that the "extreme violations" that Juranitch accused him of committing be listed for his review before the parties had any further discussions.  Exhibit 12:  Email dated June 28, 2010 from Wortley to Juranitch and Roberts.  Juranitch refused to provide any such listing.

---

involuntary bankruptcy the company the two men had invested in together.  *See* Exhibit 12:  Email dated June 22, 2010 from Tarrant to Wortley ("Thanks for a great time at Pebble.").

[32] Wortley wrote:

> "Jim, I am writing in hope that we can finally put all emotion behind us and act as businessmen.  I would like to meet with you to calmly discuss the future of Global Energies.  We have a fiduciary [sic] duty to all stakeholders of the enterprise and under the Amended and Restated Operating Agreement, as I am sure you are aware we (Jim & Joe) must consent to virtual [sic] any major actions of the entity.  If you prefer to have Rich Tarrant also present, that's fine.  If you prefer to do this in the context of a mediation that is also fine.  We have a lot of good history.  We started this venture as friends, I would like for all of us to successfully continue the venture as businessmen and yes perhaps even better friends."

*Id.*

74.     Throughout these communications in late June, Tarrant, Roberts and Juranitch continued to keep from Wortley the fact that they were prepared and intended to file the involuntary petition against Global Energies.  They also kept from Wortley any knowledge of the developments in Marion, Iowa.

75.     The involuntary petition was filed by Chrispus as a single petitioner based on the allegation that there were less than 12 unsecured creditors with non-contingent, undisputed claims.  The basis for Chrispus' unsecured claim against Global Energies was the interest on the 2009 Chrispus Loan that came due on May 29, 2010.   Notwithstanding the circumstances, including the protracted negotiations with Wortley and the personal contacts between Wortley and Tarrant during June 14-21, 2010[33], Roberts (on behalf of Chrispus) secretly declared the note to be in default and instructed Chrispus' attorneys in Florida to file the involuntary petition.  No notice, either of the default or the intention to file the bankruptcy, was provided to anyone affiliated with Global Energies until _after_ the petition was filed.

76.     The involuntary petition was filed at 3:00 PM on July 1, 2010.  At 4:35 PM on that day, Roberts sent an email to Juranitch (purportedly still acting as the President of Global Energies) and to Wortley that the involuntary petition had been filed:

> Due to the significant impasse created by the existing operating agreement, the close down of all operations of Global Energies and the apparent lack of willingness to restructure the existing operating [sic], you have left Chrispus Venture Capital, LLC no other choice than to place Global Energies, LLC into involuntary bankruptcy.  That petition has been filed this afternoon at approximately 3PM."

_See_ Exhibit 12:  Email dated July 1, 2010 from Roberts to Juranitch and Wortley.

77.     Two hours later, at 6:26 PM, Roberts, acting on behalf of Chrispus, emailed to Juranitch a formal "notice of default by Global Energies on the note to Chrispus Venture

---

[33] _See_ footnote 31, _supra._

Capital". *See* Exhibit 12:  Email dated July 1, 2010 from Roberts to Juranitch; Letter dated July 1, 2010 from Roberts, as President of Chrispus Venture Capital to Juranitch, as President of Global Energies, attached hereto as Exhibit 20.  The letter was not delivered to Global Energies office and neither the email nor the letter was ever served on Wortley in his capacity as a Managing Member.[34]  **Further, the service provisions in the 2009 Chrispus Loan do not provide for service by email**.  *See* Exhibit 10 at Section 5.3.

78.    When Wortley learned of the bankruptcy filing, his first reaction was to contact Tarrant, who claimed not to have known about the filing, although Tarrant later acknowledged to Wortley that he knew in June it was contemplated.

79.    Learning that Chrispus had filed the involuntary based on an alleged default by Global Energies on the 2009 Chrispus Loan, on July 6, 2010, Wortley transmitted to Roberts at Chrispus a check in the amount of $31,709.59 "representing interest for the promissory note dated May 29, 2009."  *See* Letter dated July 6, 2010 from Wortley to Roberts, attached hereto as Exhibit 21.[35]  On July 9, 2010, Roberts returned the check to Wortley stating, "On the advice of counsel, post petition payments on unsecured debt can not be accepted."  *See* Letter dated July 9, 2010 from Roberts to Wortley, attached hereto as Exhibit 22.  The payment was tendered, however, during the "gap period" between the filing of the involuntary petition and the entry of the order for relief.  Therefore, Global Energies, and/or Wortley acting on its behalf, was not prohibited from making the "post petition payment".[36]

---

[34] Wortley did not learn of the notice of default letter until after the November 18, 2010 hearing to approve the sale of Global Energies' assets to Chrispus.  A copy of the default letter was included in the papers produced by Chrispus, et al. on the night before that hearing.  There was no time for Wortley and his attorneys to review the papers produced prior to the hearing.

[35] For this payment, Wortley advanced funds which were deposited into the Global Energies account and then wrote the check to Chrispus on Global Energies' account.

[36] Bankruptcy Code § 303(f) provides:

> Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and <u>until an order for relief in the case</u>, any business of the debtor may continue to operate, and the

# LEGAL ARGUMENT

## The Standards for Dismissal

80.     Bankruptcy Code § 1112(b) provides, in pertinent part:

> on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested … dismissal is not in the best interests of creditors and the estate, the court <u>shall</u> … dismiss a case under this chapter, [if it] is in the best interests of creditors and the estate, if the movant establishes cause.

Subsection (4) provides, in pertinent part:

> (4) For purposes of this subsection, the term "cause" includes (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; *** (E) failure to comply with an order of the court; *** (M) inability to effectuate substantial consummation of a confirmed plan ….

Bankruptcy Code § 1112(b)(4).

81.     "[T]he prosecution of a Chapter 11 case in bad faith (*i.e.* for the purpose of abusing the judicial process and the purposes of Chapter 11 reorganization) constitutes 'cause' for dismissal of a [Chapter 11] petition." *The Bal Harbour Club, Inc. v. AVA Development, Inc.,* 316 F.3d 1192, 1193 (11th Cir. 2003).

82.     "We have held cause for dismissal exists when a bankruptcy petition was not filed in good faith." *Pegasus Wireless Corp. v. Alex Tso,* 2010 WL 3096149, **1 (11th Cir. Aug. 9, 2010) (citing *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir. 1988)); *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir. 1984).

83.     "Although there is no precise test for determining bad faith, courts have recognized factors which 'show an intent to abuse the judicial process and the purposes of the reorganization provisions.'" *Dixie Broadcasting, Inc. v. Radio WBHP, Inc.,* 871 F.2d 1023, 1027

---

debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced.  [Emphasis added].

(11th Cir. 1989) (quoting *In re Natural Land Corp.,* 825 F.2d 296 (11th Cir. 1987)). "These factors include the timing of the filing of the petition . . . whether the debtor is financially distressed . . . whether the petition was filed strictly to circumvent pending litigation, whether the petition was filed solely to reject an unprofitable contract." *Dixie Broadcasting,* 871 F.2d at 1027 (internal citations and internal quotations omitted).

84.      While the Bankruptcy Code does not expressly authorize a court to dismiss for lack of good faith, "every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.),* 779 F. 2d 1068, 1071 (5th Cir. 1986); *see also Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670, 674 (11th Cir. 1984).

85.      One of the basic underpinnings of the good faith doctrine is that "Congress has never intended that bankruptcy be a refuge for the irresponsible, unscrupulous or cunning individual." *Johnson v. Vanguard Holding Corp. (In re Johnson),* 708 F.2d 865, 868 (2d Cir. 1983) ("'Good Faith', while not defined by statute or legislative history, …certainly does, however, require 'honesty of intention' …"); *In re Metropolitan Realty Corp.,* 433 F.2d 676, 678 (5th Cir. 1970).

86.      Courts considering dismissal based on bad faith also consider the totality of the circumstances and whether such circumstances demonstrate that continuation of the chapter 11 case would promote injustice and shelter misconduct.  Cases finding good faith to be lacking include; *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.),* 709 F.2d 762, 765 (1st Cir. 1983) (use of bankruptcy as a vehicle to resolve disputes solely between equity participants); *Caruso Enters., Inc. v. U.S.A. Motel Corp. (In re U.S.A. Motel Corp.),* 450 F.2d

499, 504-06 (9th Cir. 1971); *Dubladenhill, Inc. v. Sharretts*, 375 F.2d 558, 560 (4th Cir. 1967);

*Smith v. Piccadilly Realty Co. (In re Piccadilly Realty Co.)*, 78 F.2d 257, 261 (7th Cir. 1935)

(use of bankruptcy as a vehicle to defraud others); *Shapiro v. Wilgus*, 287 U.S. 348, 355, 53 S.

Ct. 142, 77 L. Ed. 355 (1932) (judicial remedy of federal receivership could not be employed to

preserve fraudulent transfer); *In re Wisun & Golub, Inc.*, 84 F.2d 1, 2 (2d Cir. 1936).

87.    An important factor in determining the exercise of bad faith is whether material

facts have been misrepresented.  If the debtor hides assets, violates court orders and refuses to

follow chapter 11 procedure, the court may find this conduct sufficient to establish a lack of

good faith.  *See First Nat'l Bank of Sioux City v. Kerr ( In re Kerr)*, 908 F.2d 400, 404 (8th Cir.

1990) (commingling of assets, self-dealing, and evasive conduct justified dismissal); *In re

Boughton*, 243 B.R. 830, 834-36 (Bankr. M.D. Fla. 2000) (concealment of assets justified

dismissal for bad faith); *In re Rognstad*, 121 B.R. 45, 50-51 (Bankr. D. Haw. 1990) (case

dismissed for lack of good faith due to hiding of assets, squandering of money, and undisclosed

post petition financial transactions).

**The Involuntary Petition was Filed For No
Reason Other Than To Resolve a Dispute
Between Equity Holders**

88.    The involuntary petition was filed by Tarrant and Juranitch as a fast-track method

to oust Wortley.  Their plan was to use the Bankruptcy Code to sell substantially all of the assets

of Global Energies to Chrispus "free and clear of all liens, claims and encumbrances" so that

Chrispus could then transfer those assets to a new entity Tarrant and Juranitch created for no

reason other than to take over the operations of Global Energies *without Wortley* as an owner.

89.     By following their strategy, Tarrant and Juranitch intended to circumvent the Florida State procedures for dissolving a limited liability company where the members are deadlocked in a disagreement.  This strategy was a clear abuse of the Bankruptcy Code.

90.     The Florida Limited Liability Company Act, Title XXXVI, Section 608, provides a procedure for the dissolution of a limited liability company where the members are deadlocked in a dispute.  F.S.A. Section 608.449 provides:

> Grounds for judicial dissolution.—A circuit court may dissolve a limited liability company:
> ***
>  (2)   In a proceeding by a manager or member if it is established that:
>  (a) The managers, managing members, or members are deadlocked in the management of the limited liability company affairs, the members are unable to break the deadlock, and irreparable injury to the limited liability company is threatened or being suffered ….

91.     Tarrant and Juranitch believed there was a dispute with Wortley over the management of Global Energies and their intention was to go "in a different direction" with a new company.  *See* Exhibit 5: Tarrant Depo. at pg. 45 ("We wanted Global to be settled, but we formed Plasma, because we had the people, we had some very smart people, and we wanted to keep going, but in a different direction, so that we could bring Global back to life, but we still had a business over here.").  But, to do it the right way would require filing an action in the Circuit Court to adjudicate the dissolution of Global Energies.  That would take time and could result in the possible appointment of a receiver or custodian.  *See* F.S.A. 608.4491.  Because of the imminent award of the contract in Marion, Iowa, Tarrant and Juranitch could not take the time for such a protracted proceeding.  Bankruptcy Code § 363, however, offered the ability to expedite a sale of the assets of Global Energies in a relatively short period of time, provided Tarrant and Juranitch could create the illusion that Global Energies had no present or future

value.  They would do this by shutting down the company's operations and keeping secret the developments in Marion, Iowa.

92.    Using the Bankruptcy Code as a means to resolve disputes between the members of a limited liability company is an abuse of the process and grounds for dismissal of a chapter 11 case.  *Coastal Cable*, 709 F.2d at 765 (use of bankruptcy as a vehicle to resolve disputes solely between equity participants is grounds for dismissal).  Here, there can be no question but that the only reason Tarrant and Juranitch filed the involuntary petition was to quickly resolve the deadlock they faced with Wortley, oust him from his ownership of the company and wrest the assets of the company away so that they could "go in a different direction" without Wortley.

**Global Energies' Financial Issues**
**Could Have Been Easily Resolved By**
**The Members Stepping Up to the Plate**

93.    As an equity investor of Global Energies, Wortley made loans to Global Energies and paid the expenses of Global Energies in amounts exceeding $300,000.  As an equity investor, Tarrant – through his 93%-owned company, Chrispus – made a loan of $1,000,000 to Global Energies and committed himself to make a second loan of $1,000,000.  Aside from these two insider loans, as of the Petition Date, Global Energies had debts – all of which were unsecured – of less than $14,000.[37]  No one of the non-insider unsecured debts was more than 60 days due.  Simply stated, **Global Energies was *not* a candidate for bankruptcy because of its financial situation on the Petition Date**.

---

[37] In addition to the $14,000, there was also approximately $22,000 owed to American Express for various expenses incurred by employees of Global Energies, including expenses for travel and entertainment.  However, the American Express cards used by the Global Energies employees were issued by Liberty Associates, an entity owned and operated by Wortley.  Wortley allowed the Global Energies employees to use his company's American Express credit cards.  By agreement between Wortley and Juranitch, instead of forwarding these credit card charges to Global Energies, Chrispus either paid the credit card charges directly on behalf of Liberty Associates or reimbursed Liberty Associates.

94.    All three of the equity holders and all of the employees of Global Energies believed in the future of the company.[38]  In fact, Tarrant believed so much in the future of Global Energies that, on May 10, 2010, he agreed to loan a second $1,000,000 to the company even though the goals set out in his original commitment to make the second loan had not been achieved.

95.    The undisputed facts also are that Tarrant – again acting through his company, Chrispus – voluntarily paid off most of the debts owed by Global Energies during late May and early June of 2010.   Tarrant paid all of the salaries and expenses of the Global Energies employees, the invoices owed to consultants and amounts owed to other vendors during this time period.  *See* Exhibit 12, *passim*.  He did this, of course, for the self-interested purpose of getting the Global Energies creditors down to what he believed would be less than twelve so that Chrispus, alone, could file the involuntary petition.

96.    Notwithstanding his true purpose, Tarrant's actions demonstrate that, as an equity owner of Global Energies, he was willing to put up his money in order to keep Global Energies in operation.

97.    In May and June of 2010, it was very clear that Global Energies was on the verge of winning its first contract.  *See* Exhibits 15, 17, 18, 19.  With that first contract in place, the company would be able to raise more capital, either through venture capital or loans.  Then, once the facilities in Marion, Iowa were built and put into production, the first revenues of the company would begin to flow.  Equally important, the Marion, Iowa project would give the company the ability to demonstrate to other communities exactly what the Global Energies technology could accomplish, which would lead to more contracts and more revenues.

---

[38] As discussed below, two of the equity holders – Tarrant and Juranitch – had good reason for their belief in the company based on information they deliberately withheld from the third equity holder – Wortley.

98.     The only thing standing in the way of such unfettered success was the so-called "pissing contest" between Juranitch and Wortley.  Both Tarrant and Wortley were willing and able to infuse more money into the company, either through capital contributions or through additional loans.  Tarrant had already agreed to do this and, had he been asked – and known about the looming Marion, Iowa contract – Wortley would have infused more money into the company also.  Problem was, Wortley only had money.  Juranitch had the engineering and technology know-how.

99.     There is no requirement under the Bankruptcy Code that a debtor be in financial distress to qualify for chapter 11.  However, whether the debtor is financially distressed is a factor for the Bankruptcy Court to consider when deciding whether to dismiss an involuntary chapter 11 as a bad faith filing.  *Dixie Broadcasting,* 871 F.2d at 1027.  Here, any "financial distress" could have and would have been resolved by Tarrant and/or Wortley, both equally capable of infusing more cash into Global Energies.

100.    Tarrant created the illusion of a "financial distress" when his company, Chrispus, secretly declared Global Energies in default under the existing 2009 Chrispus Loan.  Incredibly, Chrispus did not declare that "default" or otherwise give notice of a default until <u>after</u> the involuntary petition had been filed.  *See* Exhibit 20.

101.    It is fair to note that, under the terms of the 2009 Chrispus Loan, the requirement for notice of a default was waived by Global Energies.  *See* Exhibit 10.  However, the 2009 Chrispus Loan also provided that "Payments of accrued interest only shall be due and payable in arrears on each anniversary date of this Note.  At the option of Lender, any interest not paid within ten (10) days of the date it becomes due shall be added to principal and become a part thereof, and thereafter bear interest at the same rate (including any applicable default rate) as the

principal." *Id.*  Thus, it was entirely under Tarrant's control to avoid the "default" and simply declare the unpaid interest payment that came due on May 29, 2010 as additional "principal".

102.    Tarrant acted on his own to create a default that would enable Chrispus to become a creditor "qualified" to file the involuntary petition.  Coupled with Tarrant's actions to payoff other creditors of Global Energies so that there would be less than twelve creditors, Tarrant further took actions to set the stage so that Chrispus could file the involuntary petition as a "single creditor" pursuant to Bankruptcy Code § 303(b)(2).

103.    Self-dealing by an insider is sufficient to establish a lack of good faith and to justify dismissal of a chapter 11.  *Kerr*, 908 F.2d at 404 (self-dealing justified dismissal).  Here, the facts clearly demonstrate that Tarrant acted for his own self interest when he masterminded the events during May and June, 2010 so that Chrispus could put Global Energies into an involuntary bankruptcy.

**Tarrant's and Juranitch's Actions**
**Warranted Close Scrutiny By This Court**

104.    "Chrispus" is just another name for "Tarrant".  In his deposition on October 18, 2010, Tarrant stated that he owns 93% of Chrispus and that Chrispus has no "management structure".  *See* Exhibit 5: Tarrant Depo. at pgs. 8-9.  He further testified that he could not keep track of which investments were by Chrispus and which ones he held personally.  "[Chrispus has] got about four, five of them now. I have a couple of companies in my name, a couple in Chrispus.  I keep getting confused as to which ones are personal and which ones are Chrispus."  *Id*.

105.    Tarrant had considerable influence over the business and decision-making at Global Energies:

- Tarrant loaned $1,000,000 to Global Energies and was prepared to loan a second $1,000,000 as of May 10, 2010.

- Throughout May and June, 2010 (and, on information and belief, earlier than that), Tarrant communicated with and ultimately partnered with Juranitch to form Plasma Power for the purpose of taking over Global Energies' business.

- Starting at least in early May, 2010, Tarrant planned the involuntary bankruptcy of Global Energies.

- During May and June, 2010, Tarrant arranged for and did pay the claims of Global Energies employees, consultants and vendors in order to reduce the total number of Global Energies creditors to less than twelve.

106.    Moreover, Tarrant – acting on behalf of his company, Chrispus – is an insider of Global Energies pursuant to Bankruptcy Code  § 101(31).

107.    Whether a party is an insider is properly characterized as a mixed question of law and fact.  *In re Florida Fund of Coral Gables, Ltd.*, 144 Fed. Appx. 72, 74 (11th Cir. 2005).  "By virtue of the non-limiting term 'includes' the" definition of "insider" in Bankruptcy Code §

101(31) "is intended to be illustrative rather than exhaustive." *Florida Fund of Coral Gables,* 144 Fed. Appx. at 75 (citing *In re Krehl,* 86 F.3d at 741; *see also* 11 U.S.C. § 102(3)).

108.    A limited liability company membership is equivalent to a corporate directorship and, therefore, even absent a showing of control, a limited liability company <u>member</u> is considered an insider.  *In re Longview Aluminum, LLC*, 431 B.R. 193 (N.D. Ill. 2010)).

109.    In *Longview Aluminum,* the court explained that a member of a limited liability company would be analogous to a director of a corporation under Delaware law, making Bankruptcy Code § 101(31)(B) apply.  Further, under Bankruptcy Code § 101(31)(B) a "director of a debtor" and a "person in control of the debtor" are separately listed and, therefore, an individual who fits under the definition of a "director" does not need to also have "control" to be considered an "insider".

110.    The Eleven Circuit has held, "the cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length." *Florida Fund of Coral Gables,* 144 Fed. Appx. at 75 (citing *In re Holloway,* 955 F.2d at 1008, 1011 (5th Cir.1992)).

111.    Tarrant – through Chrispus – held a close relationship to Global Energies and its other two Members and, as discussed herein, the sale of substantially all of the assets of Global Energies to Chrispus pursuant to Bankruptcy Code § 363 was anything but arm's length.

112.    Tarrant – under the guise of Chrispus – acted as the single petitioner on the involuntary petition.[39]  Immediately after the order for relief was entered and Mukamal was

---

[39] The involuntary petition was signed by Roberts, the owner of the other seven percent interest in Chrispus and the designated "Managing Member" of Chrispus.  Notwithstanding Tarrant's assertion that he "turned over" all

appointed as the chapter 11 trustee, Tarrant – again under the guise of Chrispus – offered Chrispus to be the "stalking horse" bidder to acquire substantially all of the assets of Global Energies.

113.    Tarrant was, at once: (i) a Member of Global Energies; (ii) the largest unsecured creditor of Global Energies and as such, one of the primary sources of working capital for Global Energies; (iii) the sole petitioning creditor to put Global Energies into bankruptcy; and (iv) the Stalking Horse bidder for substantially all of the assets of Global Energies.  Tarrant not only had substantive control over the future of Global Energies, he manipulated Global Energies so as to oust Wortley from the business and wrest ownership of Global Energies' assets so that he, Tarrant, could use those assets to take over the Marion, Iowa project and all other business opportunities that Global Energies had been or could have been pursuing.

114.    Tarrant owed a fiduciary duty to Global Energies and to the other Members of Global Energies based on his position as a Member.  As such his conflicting roles during the months leading up to the Petition Date should have signaled the need for close scrutiny by this Court and the chapter 11 trustee.

115.    Florida's Limited Liability Companies Act provides, in pertinent part, for the duty of loyalty of a member within a limited liability company such as Global Energies:

> (2) In discharging a manager's or managing member's duties, a manager or managing member is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:  (a) one or more members or employees of the limited liability company whom the manager or managing member reasonably believes to be reliable and competent in the matters presented;
> ***

---

decision-making regarding the Global Energies situation to Roberts in June 2010, *see* Exhibit 12, *passim*, and his feigned surprise when the involuntary petition was filed, *Id.*, Roberts at all times kept Tarrant advised of actions and events that occurred leading up to the bankruptcy filing and, more important, Tarrant actively participated in the decision to put Global Energies into bankruptcy in order to wrest the assets of Global Energies away from Wortley. *Id.*

(4)  A <u>member</u> … is not acting in good faith if the <u>member</u> … has knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (2) unwarranted.

F.S.A. § 608.4225 [Emphasis added].

116.  Wortley, one of the two Managing Members of Global Energies, relied on Tarrant not to do or cause to be done anything that would hinder or endanger Global Energies.  Wortley, unaware of any crisis looming, relied on Tarrant, as a Member of Global Energies, to act in the best interest of Global Energies and, *inter alia*, either convert the interest payment that was set to come due on May 29, 2010 into additional principal or, at the least, provide notice to Wortley that Chrispus wanted the interest to be paid.  Wortley had good reason to rely on Tarrant.  Not only were they co-investors in Global Energies, Wortley believed they were "friends".  *But see* footnote 31, *supra*.

117.  Tarrant breached the trust and acted in bad faith when he caused Chrispus to secretly declare Global Energies in default of the 2009 Chrispus Loan and, without any prior notice to Wortley, a Managing Member, placed Global Energies into involuntary bankruptcy.

118.  Tarrant's multiple roles leading up to the Petition Date created a clear conflict of interest and, because of and in conjunction with that conflict of interest, Tarrant breached his duties to Global Energies and the other Members of Global Energies when he secretly declared Global Energies to be in default on the 2009 Chrispus Loan and then, based solely on that alleged default, placed the company, of which he was Vice Chairman, into <u>involuntary</u> bankruptcy for his personal gain.

119.  Juranitch also breached his duty of loyalty owed to Global Energies and the other Members of Global Energies through his actions to aid and abet Tarrant's conspiracy to declare a secret default in order to place Global Energies into involuntary bankruptcy.

120.     Because of their conflicts of interest and the breaches of their duties of loyalty, the actions of Tarrant and Juranitch should have raised a higher level of scrutiny with regard to the involuntary filing and the expedited sale of substantially all of Global Energies' assets. It should have been made clear to Mukumal, in his position as the chapter 11 trustee, and to this Court, that Tarrant and Juranitch were using the Bankruptcy Code and this Court to oust Wortley and to seize the assets of Global Energies for their personal self-interest and benefit.

121.     The order for relief, based on the involuntary petition filed by Tarrant – through Chrispus – should not have been entered. Moreover, the sale of Global Energies assets to Tarrant should not have been approved. This bankruptcy needs to be dismissed as having been filed in bad faith.

**Juranitch and Tarrant (read: Chrispus)**
**Manufactured The Facts To Enable**
**Chrispus to be The Single Petitioning Creditor**

122.     Bankruptcy Code § 303(b)(2) provides, "An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter … 11 of this title … (2) if there are fewer than 12 such holders, excluding any employee or insider of such person …, by one or more of such holders that hold in the aggregate at least $13,475 of such claims".

123.      Tarrant, acting for Chrispus, secured the list of Global Energies' accounts payable and, with the help of Juranitch, proceeded to pay those creditors that Juranitch thought would be "critical" to their future business operations and other creditors in order to get the total number of unsecured creditors with non-contingent, undisputed claims down under twelve. Tarrant thought he had completed this effort on or before May 26, 2010, a little more than one month before the involuntary petition was filed. *See* Exhibit 12: Email dated May 25, 2010 from Tarrant to Moody, Roberts.

124.    On October 11, 2010, Mukamal filed the Debtor's Schedules, including Schedule F – Creditors Holding Unsecured Nonpriority Claims.[40]  Schedule F lists 28 unsecured creditors, all of which are listed by Mukamal as "disputed".  Of these, nine are arguably either insiders or employees.[41]  What is not disclosed by Schedule F is the extent to which the listed claims are disputed.  Accordingly, notwithstanding the "due diligence"  undertaken by Chrispus to payoff unsecured creditors in order to get them down to less than twelve, without including the alleged claim of Chrispus, *see infra*,  there were, as of the Petition Date, nineteen (19) unsecured claims against Global Energies with no evidence to indicate that the entirety of their claims were non-contingent and not disputed.

125.    Without more from the Petitioning Creditor, Mukamal, the chapter 11 trustee, has filed with this Court affirmative evidence that there were, as of the Petition Date, twelve or more unsecured creditors some or all of which may have had non-contingent, undisputed claims totaling at least $13,475.  *See* Bankruptcy Code § 303(b)(2).

126.    Prior to the entry of the order for relief by this Court, no other creditor entered an appearance in support of the involuntary petition.  *See* Bankruptcy Code § 303(c).   Thus, to the extent there were twelve or more unsecured creditors as of the Petition Date, Chrispus was not authorized to file the involuntary petition as the sole Petitioning Creditor.

127.    The involuntary petition filed by Chrispus was improper because there were twelve or more unsecured creditors with non-contingent, undisputed claims collectively in excess of $13,475 and, accordingly, the involuntary petition must now be dismissed as improperly filed.

---

[40] Pursuant to this Court's Order, Wortley filed his Supplement stating that the chapter 11 trustee's Schedules were accurate to the best of his knowledge at the time.  Neither Chrispus nor Juranitch has complied with this Court's Order and filed their Supplements indicating either their concurrence, objection or correction to the chapter 11 trustee's Schedules.  *See* footnote 8, *supra*.

[41] Joseph G. Wortley (insider); Joseph R. Aja (employee); Jay Barrow (employee); Dr. Louis Joseph Cicero, Jr. (arguably an employee – consultant under contract); Dennis Drvenkar (employee); Liberty Associates (arguably an insider based on affiliation with Wortley); Jim Juranitch (insider); Chrispus Venture Capital (insider); Carmen Santiago (employee); Dr. James Richardon (arguably an employee – consultant under contract).

**Global Energies was Not In Default**
**On the 2009 Chrispus Loan as of**
**The Petition Date**

128.     Pursuant to the terms of the 2009 Chrispus Loan, interest came due on the annual anniversary of the 2009 Chrispus Loan – May 29th.  *See* Exhibit 10.   Importantly, the 2009 Chrispus Loan further provided that, "At the option of Lender, any interest not paid within ten (10) days of the date it becomes due shall be added to principal and become a part thereof, and thereafter bear interest at the same rate (including any applicable default rate) as the principal." *Id*.  On May 25 and 26, no payments from Global Energies were due and payable, yet Tarrant – and his co-conspirator Juranitch – were already planning that Global Energies would not make the interest payment due on May 29th <u>and</u> that Tarrant would <u>not</u> opt to add the unpaid interest payment to the principal amount of the 2009 Chrispus Loan.

129.     In fact, on May 29, 2010, Juranitch – the President of Global Energies – caused Global Energies not to make the interest payment due on the 2009 Chrispus Loan and Tarrant and Roberts, acting for Chrispus, decided that Chrispus would not add the unpaid interest payment to the principal amount of the 2009 Chrispus Loan.

130.     On July 1, 2010 at 6:26 PM – three and a half hours <u>after</u> the involuntary petition was filed – Roberts, acting on behalf of Chrispus, emailed to Juranitch a formal notice of default. *See* Exhibit 12: Email dated July 1 from Roberts to Juranitch and Exhibit 20.  In other words, on July 1, 2010 when the involuntary petition was filed by Chrispus as the sole Petitioning Creditor, Global Energies *was not in default* because Chrispus had not declared its option not to add the annual interest payment to the principal balance owed on the 2009 Chrispus Loan.  Therefore, as of the Petition Date, Global Energies was not, technically, in default which means Chrispus was not qualified to act as the Petitioning Creditor.

131.     More important, when Wortley first learned that Chrispus had declared a default, on July 6, 2010, Wortley immediately tendered the interest payment to Chrispus.  Exhibit 21. Roberts, acting on behalf of Chrispus and claiming to act on the advice of his attorney, returned the payment.  Exhibit 22.  To the extent Robert's return of the tendered payment was pursuant to advice of his attorney, that advice was mistaken.  *See* footnote 36, *supra*.

132.     As of July 8, 2010, the Court had not entered an order for relief or any other order limiting the business operations of Global Energies.  There was, therefore, no legal reason for Chrispus to refuse to accept the tendered payment of the interest due on the 2009 Chrispus Loan – other than the fact that acceptance of the payment would have required Chrispus to withdraw the involuntary petition.

133.     On July 1, 2010, Global Energies was not in default of the 2009 Chrispus Loan. The only persons who knew the payment due on May 29, 2010 had not been paid were the co-conspirators – Tarrant and Juranitch.  Importantly, the interest payment that <u>was</u> due on May 29, 2010, was tendered to Chrispus by Wortley as soon as he became aware that Chrispus had not opted to add the interest to the principal.  The fact that Chrispus – through Roberts – returned the tendered payment should now be construed by this Court as Chrispus opting to exercise its right to add the interest payment amount to the principal amount due on the 2009 Chrispus Loan. Because of Tarrant's actions – acting through Chrispus – to keep the alleged default secret, Chrispus should not be deemed qualified to act as the single Petitioning Creditor.

**Tarrant and Juranitch Withheld**
**Information from the Court and the Trustee**
**Regarding Global Energies True Value**

134.    Finally – and perhaps most egregiously – **Tarrant and Juranitch withheld from this Court and the chapter 11 trustee significantly important information** regarding the true value of Global Energies in order to minimize the amount Chrispus would have to pay as the winning bidder for the acquisition of substantially all of Global Energies assets.  They failed to tell anyone that they had successfully negotiated a lucrative contract with the city of Marion, Iowa.

135.    Prior to the Spring of 2010, Global Energies had no significant source of revenue. Notwithstanding the patents and technologies available to Global Energies for the conversion of trash into energy, and despite more than a year of intensive marketing efforts, Global Energies had been unable to generate any revenue from the use of its inventions and technologies.

136.    In late April, Juranitch, Tarrant and other employees of Global Energies spent several days in Marion, Iowa promoting its plasma arc technologies.  On May 20, 2010, Global Energies submitted its proposal to the City of Marion, Iowa for construction of facilities and installation of its plasma arc technologies for the conversion of Marion's trash into clean and efficient energy.

137.    On June 29, 2010 – two days prior to the Petition Date – the City Council of Marion, Iowa took up on its scheduled agenda "Consideration of recommendation for plasma arc project." Exhibit 18.

138.    On July 15, 2010, the City Council of Marion, Iowa approved adoption of the motion  "to select Global Energies/Plasma Power, LLC, for future Plasma Arc Project."  Exhibit 23.

139.    On November 30, 2010, the Marion City Council took up Resolution No. 21448 approving a Memorandum of Agreement with Plasma Power regarding the Plasma Arc Project, Exhibit 19, and on December 2, 2010, the Memorandum of Agreement was approved by the Marion City Council and became effective. *Id*. That Memorandum of Agreement was signed by Juranitch as President of Plasma Power on <u>November 28, 2010</u>. *See* Exhibit 19, page 2 of Memorandum of Agreement.

140.    This Court approved the sale of substantially all of the assets of Global Energies to Chrispus on <u>November 30, 2010</u>.[42] The purchase price for the assets was $570,000.

141.    At no time prior to entry of the Court's order approving the sale of assets to Chrispus, did Chrispus, Tarrant, Juranitch or anyone else disclose to this Court or the chapter 11 trustee the fact of the Memorandum of Agreement entered into with Marion, Iowa.[43]

142.    Plasma Power <u>is</u> Global Energies. Marion, Iowa contracted for the plasma arc project based on the Proposal submitted by Global Energies. Any subsequent proposal submitted to Marion, Iowa by Plasma Power was, in all respects, the same proposal submitted by Global Energies. Moreover, Plasma Power is made up of the same management (Juranitch and Tarrant), the same employees and the same technology that Global Energies had. Juranitch himself stated that Plasma Power is a spin off of Global Energies. Exhibit 16.

## CONCLUSION

Based on all of the evidence now known, including new evidence that did not come to light until after this Court entered the Sale Order, there is a very clear conclusion:    This

---

[42] As of the date of this Motion, the Sale has not closed based on the fact that the chapter 11 trustee has not filed an accounting of the sale as required by this Court in the Sale Order.
[43] Chrispus and Juranitch were subject to this Court's Order to provide this information through their Supplements to the Schedules. They have not complied with that Order. *See* footnote 8, *supra*, and associated text.

involuntary chapter 11 should never have been filed and this Court should not have entered the order for relief.  This Court, and the chapter 11 trustee, was misled by the Petitioning Creditor and its co-conspirators on several accounts:

- The Petitioning Creditor, Chrispus, did not qualify to file the involuntary petition under Bankruptcy Code § 303(b)(2) because, as of the Petition Date, there were, in fact, more than twelve unsecured creditors.

- Tarrant, acting for Chrispus, and Juranitch chose to pay certain selected creditors in order to manipulate Global Energies' creditor body so that there would be less than twelve unsecured creditors.

- The 2009 Chrispus Loan was not in default as of the Petition Date.  The insiders – Tarrant and Juranitch – secretly conspired to create the default by (i) Tarrant secretly telling Juranitch that Chrispus (Tarrant's company) would not add the interest payment that was due on May 29, 2010 to the principal amount of the 2009 Chrispus Loan; (ii) Juranitch failing to take any action to make the interest payment (including failing to tell Wortley, the other Managing Member of Global Energies, that the interest payment had to be paid); and (iii) Tarrant, acting for Chrispus, secretly declaring the default (and delaying issuing any notice of the default until after the Petition Date).  This is a further basis to find that Chrispus was not qualified to file the involuntary petition as the sole Petitioning Creditor.

- Further, the interest payment due on the 2009 Chrispus Loan was timely paid. Immediately after Wortley received knowledge that Chrispus had demanded payment of the interest (instead of adding the interest to the principal amount), Wortley tendered the interest payment in full.  The improper rejection and return of the payment by Chrispus should be deemed by this Court to have been Chrispus' consent to add the interest payment to the principal amount.

- **Chrispus** – an equity holder of Global Energies, the single Petitioning Creditor and the stalking horse and sole bidder on Global Energies' assets; **Tarrant** – an equity holder of Global Energies and the owner and controller of Chrispus; and **Juranitch** – an equity holder of Global Energies and one of the two Managing Members of Global Energies deliberately and intentionally withheld from this Court and the chapter 11 trustee any and all knowledge about the Marion, Iowa contract and the significant value of that contract as an asset of the Global Energies Estate.

- Tarrant and Juranitch conspired to destroy Global Energies and its value by secretly creating a new entity – Plasma Power – to which the improperly transferred the Marion, Iowa contract and by Juranitch illegally and without authorization converting Global Energies equipment and personal property.

- Chrispus, through Tarrant, and Juranitch misused the Bankruptcy Code in order to circumvent the Florida statutes governing the rights of members and managing members of a limited liability company and thereby improperly oust Wortley from his roles as a Managing Member of and investor in Global Energies.

WHEREFORE, Joseph G. Wortley requests that this Court enter an order (a) dismissing, *ab initio*, the involuntary chapter 11 bankruptcy filed against Global Energies, (b) awarding costs and attorneys fees in favor of Wortley and against Tarrant, individually, Juranitch, individually and Chrispus, (c) awarding punitive damages as this Court deems just and proper, and (d) such other and additional remedies as this Court deems appropriate.

Respectfully submitted,

**GRANER LAW GROUP, P.A.**

   /s/ Steven K. Platzek
Steven K. Platzek (FL Bar No. 0895741)
720 East Palmetto Park Rd.
Boca Raton, FL 33432
561-750-2445
561-750-2446 Facsimile
Skp@granerlaw.com

OF COUNSEL:

Craig B. Young*
**KUTAK ROCK LLP**
1101 Connecticut Avenue, NW, Suite 1000
Washington, D.C. 20036
202-828-2328
202-828-2488 Facsimile
craig.young@kutakrock.com

* Motion *Pro Hac Vice* pending.